1  Your name: Robertson, R., plaintiff,

2  Address: 5335 Brader Blvd.

3  Dublin, CA 94568

**FILED**

4  Phone Number: (775)-335-7773 (mcss.)

**JAN 13 2022**

5  E-mail Address:

CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA
SAN JOSE OFFICE

6  Pro se

7

8                    UNITED STATES DISTRICT COURT

9                    NORTHERN DISTRICT OF CALIFORNIA

10     Division *[check one]*: ☐ San Francisco ☐ Oakland ☒ San Jose ☐ Eureka

11

12  ROBERTSON, R.,                     )  Case Number: 20-cv-02523 BLF

13  _____                )  **MEMORANDUM IN SUPPORT OF**

14          Plaintiff,                 )  **OPPOSITION TO MOTION** *[type of motion]*

15          vs.                        )  FOR SUMMARY JUDGEMENT (DKT, #44) AND

16  KAISER-NEVEL, J., et. al.,         )  CROSS-MOTION AS TO STATE LAW CLAIMS

17  _____                )

18  _____                )  DATE: February, 10th, 2022

19  _____                )  TIME: 9:00 a.m.

20          Defendant.                 )  JUDGE:

21                                     )  Hon. - Beth Labson Freeman

22

23

24

25

26

27

28

OPPOSITION TO MOTION FOR SUMMARY JUDGEMENT - DKT#44/CROSS MOTION
CASE NO.: 20-cv-02523 BLF _____; PAGE 9 OF 9 *[JDC TEMPLATE – rev. 2017]*

## I.  FACTUAL BACKGROUND

*[Write the facts relevant to the motion. At the end of each sentence, write where evidence of that fact can be found. See the Instructions for more detailed information.]*

I.  Standard of Review

At all times mentioned, here-in, Plaintiff held the status pretrial/detainee, housed at Santa Rita Jail–Housing Unit #22–Dublin CA (here-in, "H.U. #22", H.U. #22–at all times mentioned–was designated a Class I Special Management housing unit, as all inmates housed at this location were classified Class I Special Management Inmates, per Alameda County Sheriff's Office Policy/Procedure (here-in, "ACSO P/P"), 8.12 "Inmate Observation and Direct Visual Supervision," 8.12 III (c)(1) (as attached: Exhibit "A." / www.alamedacountysheriff.org/about-us/public-policies). In addition to the-previously-stated designations and at all times mentioned, Plaintiff was/is a member of multiple-protected classes (TAC, 13 at #22, 14 at #27). Accordingly, the standards of Bell v. Wolfish, 441 U.S. 520, 99 S. Ct. 1861 (1979); 42 U.S.C.A., Section 12107, et. seq.–i.e., American's with Disabilities Act or "ADA"–are applicable.

II.  Undisputed Facts of 1-22-20

On 1-22-20, Defendant, Russell and Plaintiff had a verbal dispute, which ended with both parties issuing threats of a "write-up" (TAC, 14 at #28, 15 at #30). Russell, with the threat of adverse action against Plaintiff for engaging in free speech – First Amendment, U.S. Const. – violated a clearly established right (Austin v. Terhune, 367 F. 3d 1167, 1171-9th Cir. 2004). Additionally, Russell's sheds qualified immunity, having asserted no affirmative defense to this conduct in Defendants' Answer (Dkt. 42, at 6-7), he has waived that right. On personal knowledge, Defendants' ...

(continued, pg. 3)

1  *Insert this page as needed to continue the facts or argument section, or to write an introduction.*

2  ... First, Third, Fourth, and Eight Affirmative Defenses – must also fail

3  (Dkt. #42, at 6-7), as Defendants' omitted to addressing a material

4  fact, Bussell's conduct of 1-22-20.

5

6  III. Exhaustion and Remaining Defenses

7

8  Inmate Grievance #20-0319, was affirmed at the first-formal level

9  (TAC, 5). On personal knowledge, having received all "available" remedies at that

10  intermediate-level, Plaintiff has met the exhaustion requirement – Brown v.

11  Valoff, 422 F.3d 926, 935 (9th Cir. 2005). Further, there is no exhaustion

12  requirement, when filing a civil-rights action under 42 U.S.C., Section

13  1983 – Outdoor Media Group, Inc. v. City of Beaumont, 506 F.3d 895

14  (9th Cir. 2007).

15  A.  For the reasons stated in the preceding paragraph, Defendants' Second

16     Affirmative Defense lacks foundation and falls (Dkt. #42, at 6).

17  B.  Regarding Defendants' Fifth Affirmative Defense, on personal knowledge

18     Plaintiff's actual percentage of fault is zero (Dkt. #42, at 7).

19  C.  As to Defendants' Sixth Affirmative Defense, the previous response

20     is also applicable. On personal knowledge, Defendants' assertion of

21     the Fifth and Sixth Affirmative Defenses lack merit (Dkt. #42, 6-7).

22  D.  Defendants' lone remaining defense refers to Plaintiff's compliance

23     with the CA Government Claims Act. On par with the federal standard,

24     the 9th Circuit has held. When filed under a civil-rights statute,

25     there is no state claim presentation requirement — Ford v. Long Beach

26     Unified School Dist., 461 F.3d 1087, 1089-90 (9th Cir. 2006).

27

28                              (continued, pg. 4)

OPPOSITION TO MOTION FOR SUMMARY JUDGEMENT – DKT. #44 / CROSS MOTION

CASE NO.: 20-cv-02523 BLF              ; PAGE 3 OF 9  [JDC TEMPLATE – rev. 2017]

## II. ARGUMENT

*[Explain your response to each of the arguments made in the Motion. Go in the same order as the arguments were made in the Motion, if possible.]*

IV.   Affirmations and Objections

A.   Plaintiff objects to admission of Dkt. #44-3, at 5 (Defendants' Exhibit, D.), based on the following facts: it is indecipherable, as to who authored these "notes"; it is inadequate as a record of events which occurred on the day/night of the subject-incident and as set-forth in the TAC; it is woefully incomplete; it is only official, as the H.U. #22 note-book log or keeping "routine information" — P/P 10.05 III (B) (as attached: Exhibit, "B" — P/P 10.05 "Housing Floor/Unit Deputy Post Order"). On personal knowledge, official H.U. #22 records — on the date/time of the subject-incident (TAC, 12, at #18), were the Close Observation and 30-minute General Observation logs (P/P 8.12 III (B)(1)(b) and III (B)(2)(b)).

B.   Concurring with Defendant, Harris' BWC, Plaintiff affirms his arrival in the visiting-area was at 6:02pm, and 12 seconds thru 6:02pm, and 35 seconds (Dkt. #44-7, at 3, #8). Plaintiff lacks knowledge to ac-count for the 30-minute discrepancy in various other documents submitted by Defendants or as provided in Dkt. #42, 3, at #18.

C.   Plaintiff asserts all Defendants — a party to this action — owed duties to Plaintiff: Dkt. 2, at I.; per statute — Sect. 1027.5, Title 15, CCR (TAC, 14, at #25); and in keeping with Defendants' own policies — P/P 8.12 III (A), III (c)(1), IV (4)—(4)(b), IV (B)—IV(B)(2)(i), IV (D); P/P 10.05 IV (E), (E)(1)(d), and (E)(1)(i). Simul R.R. Simultaneous — concurrent and consecutively occurring — amnesia of only duties involving Plaintiff and Wright (TAC, 12, at #19), while remembering/performing duties involving all...   (continued)

## II. ARGUMENT

*[Explain your response to each of the arguments made in the Motion. Go in the same order as the arguments were made in the Motion, if possible.]*

... other inmates housed in #22 unit, Santa Rita Jail, is as apt to occur—as the Golden State Warriors winning Olympic gold medals for rowing (Kesner v. Superior Ct., 384 P.3d 283, 290 (Cali 2016).

Legal Arguements

A. Bussell's Involvement Established

Bussell does not deny being on duty at 5:45pm and initiating the subject-incident, by announcing Plaintiff's visit (TAC, 7, at #6). Further, Defendant, Bussell had the responsibility of "coordinating visiting-activities with the housing unit deputies— P/P 10.12 III (A)(30); (TAC, 23)— and "visually monitoring inmate activities in the visiting-booths"— P/P 10.12 III (A)(31). Plaintiff re-affirms, there are/were two-cameras in H.U. #22 visiting area, with over-lapping views—during the date/time of the subject-incident.

B. PLRA Exhaustion

As outlined— Dkt., at 3, line 10— Plaintiff has met and surpassed the 9th Circuit's standard, for the instant-action.

C. Due Process

On personal knowledge, state created liberty interests may be...
(continued

OPPOSITION TO MOTION FOR SUMMARY JUDGEMENT—DKT. #44/CROSS MOTION
CASE NO.: 20-cv-02523 BLF _____; PAGE 5 OF 9 *[JDC TEMPLATE – rev. 2017]*

*Insert this page as needed to continue the facts or argument section, or to write an introduction.*

... located in Plaintiff's right to safety-checks (TAC, 14, at #25); recreation-time (TAC, 13, at #23); to pod-time, i.e., to assemble (First Amendment, U.S. Consti); and pill call (CA Disabled Person's Act, the ADA, and Defendant's P/P 1, 14 II, III(A), III(E), and III(G)— www.alamedacountysheriff.org/about-us/public-policies). Depriving Plaintiff of any of the-stated-liberties is sufficient to support a due process claim— Austin, id, at 1170-71; Hines v. Gomez, 108 F. 3d 265, 269 (9th Cir. 1997).

D. Qualified Immunity

"That ship has sailed...", i.e. specifically as addressed— Dkt, 2, at line #22— is inapplicable to Defendant, Bussell.

E. State Law Claims Proceed

As addressed— Dkt. 3, at D.— Ford, id.

F.   Docket #44— on personal knowledge— failed to meet its burden for Summary Judgement. For that reason, based on Plaintiff's Motion in Opposition, TAC, and all papers submitted or on file for this action— Summary Judgement is in-appropriate.

V.   Cross-Motion As to State Law Claims

1.   Breach of statutory/ Duty & Negligence

(continued, page 7)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23  *[You must sign and date.]*

24  Respectfully submitted,

25

26  Date: _____    Sign Name: _____

27  Print Name: _____

28

OPPOSITION TO MOTION _____

CASE NO.: _____; PAGE ___ OF ___ *[JDC TEMPLATE – rev. 2017]*

## II. ARGUMENT

*[Explain your response to each of the arguments made in the Motion. Go in the same order as the arguments were made in the Motion, if possible.]*

A. Based on Plaintiff's status as a protected-class member - Dkt, 2, at lines #13-#16; shed all asserted-defenses - Dkt; 2, at line #22 thru 3, at line #26; Dkt. 4, at C., 5, at A., 6, at 2-9, 6, at F; and based on Defendants' own policies - P/P 10, 12 II, III (A)(10), III (A)(18)-(19), III (A)(30)-(31), III (B)(2)(h), inter alia, Defendant Bussell was culpable of breach of duty/negligence, while under CA State law - CA Evid. C., 669; Peterson v. Superior Ct., 10 Cal. 4th 1185, 1204 n. 10, 43 Cal. Rptr. 2d 836, 899 P. 2d 905 (1995); (Kesner v. Superior Ct., 384 P. 3d 283, 290 (Cal. 2016).

B. Failure to Discharge Statutory Duty/Safety Checks

As outlined - TAC, 13, at #34, 16 at #35, 17 at #36; Title 15, Sect. 1027.5; undisputed BWC footage (Dkt, 4, at D; Dkt. #44- 7, at 3, #8); and Plaintiff's irrefutable- eye witness account. Defendants Ella, Wong failed to perform 4-safety checks, Alvarez, 4, Harris, 7, and Defendant, County of Alameda, failed to discharge this duty. Cumulatively, these Defendants infringed on Plaintiff's rights under Section 1027.5, Title 15, id., and in keeping with Defendants' own policies - P/P 8, 12 III (A)-(A)(2), III (C)(2) and (4), IV (A)(4)(a)-(b)- no less than thirty instances (Tirpak v. Los Angeles Unified School Dist., 187 Cal. App. 3d 639, 232 Cal. Rptr. 61 (1986); CA Gov't. C., Sects 815.2(a) and 815.6, respectively; Bradford v. State of CA, 36 Cal. App. 3d 16, 111 Cal. Rptr. 852 (1973); ...

(continued)

# I.  FACTUAL BACKGROUND

*[Write the facts relevant to the motion. At the end of each sentence, write where evidence of that fact can be found. See the Instructions for more detailed information.]*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## II. ARGUEMENT (cont.)
~~I. FACTUAL BACKGROUND~~

*[Write the facts relevant to the motion. At the end of each sentence, write where evidence of that fact can be found. See the Instructions for more detailed information.]*

... Clausing v. San Francisco Unified School Dist.; 221 Cal. App. 3d 1224, 271 Cal. Rptr. 72 (1990).

WHEREFORE, Plaintiff prays the Court grant the following relief, according to proof:

A. Award of compensatory-damages, jointly and severly in their official capacities, against all named Deputy Defendants – for breach of statutory-mandated duty (Sect. 1027.5, id.). Additionally, for failure to discharge a statutory-mandated duty (also, 1027.5, id.); CA Gov't C., id., 815.6, id.; Bradford, id.; Clausing, id. In the amount of $500 – for each Deputy Defendant – and $1,000 – times four – as to Defendant, County of Alameda. In total: $6,000 (six-thousand dollars and zero cents).

B. Award compensatory-damages individually and in his official capacity; jointly and severly, for breach of statutory-mandated duty and negligence (Sect. 1027.5, id.; CA Evid. C., 669). In the amount of $1,000 (one-thousand dollars and zero cents), against Defendant, Bussell.

C. Award of costs – individually – against Defendant, County of Alameda, as the Court deems appropriate.

D. Award of compensatory-relief/damages – individually – against Defendant, County of Alameda, in its official capacity, in the amount...

(continued, pg. 9)

1  ..., of $750 (seven-hundred and fifty-dollars and zero cents), Payable to
2  the prisoner's rights organization— Destination Freedom / P.O. Box 803398
3  Santa Clarita, CA 91380 — for a flat-rate fee covering the services
4  and assistance rendered— which Plaintiff incurred, as a result of Defendants
5  acts or omissions and which violated Plaintiff's rights under federal/state law
6  CA Code of Civ. Proc., Sect. 1021.5, 425.16; CA Gov't. C., Sect. 800.
7
8  Pursuant to Section 1746, 28 U.S.C. and in accordance with CA law, I
9  declare - under penalty of perjury- that, to the best of my knowledge- the
10  foregoing is true and correct. Executed this 10th day of January, 2022, at
11  Dublin, CA.
12
13
14  "PLAINTIFF'S OPPOSITION TO DKT. #44
15  AND CROSS-MOTION AS TO STATE LAW CLAIMS"
16  FRCP, RULE 13(b); CIVIL L.R., RULE 7-4
17
18  cc: Donna Ziegler/Jill Sazama, (Civil L.R., Rule 5-1(b))
19    Counselors for Defendants
20    County Counsels Office
21    1221 Oak Street, #450
22    Oakland, CA  94612
23  *[You must sign and date.]*
24                                    Respectfully submitted,
25
26  Date: __1-10-22__          Sign Name: __R. Robertson-in pro per__
27                             Print Name: __R. Robertson__
28

OPPOSITION TO MOTION FOR SUMMARY JUDGEMENT-DKT. #44/CROSS MOTION
CASE NO.: 20-cv-02523 BLF_____; PAGE 9 OF 9 *[JDC TEMPLATE – rev. 2017]*

Exhibit "A".

ACSO P/P 8.12

PROPOSED REVISED POLICY

| ALAMEDA COUNTY SHERIFF'S OFFICE<br><br>DETENTION AND CORRECTIONS<br><br>POLICY AND PROCEDURE | **NUMBER: 8.12** | **PAGES: 1 of 8** |
|---|---|---|
| | **RELATED ORDERS:**<br>ACA 4-ALDF-4-2A-52<br>MJS 1213<br>P&P 13.06<br>P&Ps 8.13, 8.26, 17.02<br>*PREA 115.15* | |
| | **ISSUED DATE:** July 1, 1989 | |
| | **REVIEW DATE:** December 11, 2014 | |
| | **REVISION DATE:** March 18, 2013 | |
| **CHAPTER:** Security and Control | **SUBJECT:** Inmate Observation and Direct Visual Supervision | |

I.  **PURPOSE:** To establish policy for observation and direct visual supervision of inmates including, procedures for initiating, terminating and controlling observation logs.

II. **POLICY:** *The Alameda County Sheriff's Office has zero tolerance for sexual abuse and harassment of inmates. As such,* Inmates are subject to observation and direct visual supervision by sworn custody staff.

III. **DEFINITIONS:**

   A. DEFINITION OF TERMS:

   1. DIRECT VISUAL OBSERVATION: The act of sworn staff personally observing an inmate or group of inmates. Viewing the inmate via camera or through information from another staff member is not a Direct Visual Observation.

   2. CONTINUOUS DIRECT OBSERVATION: The act of sworn staff personally and continuously observing an inmate. Viewing the inmate via camera or through information from another staff member is not a Continuous Direct Observation.

   B. LOG TYPES:

   1. INMATE OBSERVATION LOG (IOL): The form utilized to document either the INTENSIVE or CLOSE observation of an individual inmate.

      a. INTENSIVE OBSERVATION: The observation type utilized to document direct visual observations of an inmate no less than twice every thirty (30) minutes.

      b. CLOSE OBSERVATION: The observation type utilized to document thirty -minute observations of Class I Special Management Inmates when she or he leaves the housing unit or is placed in an Isolation Cell.

   2. GENERAL OBSERVATION LOG (GOL): The form utilized to document direct visual observations of all inmates in a housing unit as controlled by the classification of the

housing unit.

    a. Hourly General Observation Log: Documents direct visual observation of general population inmates.

    b. Thirty-minute General Observation Log: Documents direct visual observation of Special Management inmates in Behavioral Health Units/Pods, Administrative Segregation Units/Pods, or Protective Custody Units/Pods.

3. SOBERING CELL OBSERVATION LOG (SCOL): The form utilized to document thirty-minute direct visual observations of inmates in a sobering cell.

4. RESTRAINT OBSERVATION LOG (ROL): The form utilized to document the application of restraints. Restraints are used only to prevent self-injury, injury to others, property damage, or other occasions as may be approved by the medical/mental health staff, the facility Commanding Officer or his/her designee.

5. ITR INMATES: When it becomes necessary to separate an inmate from general ITR population, due to behavior which prevents or delays the orderly and safe booking process, the responsible deputy shall institute an IOL and notify the ITR Supervisor of the inmate's placement. The inmate shall be subject to "Intensive Observation," as defined in Section III(D)(3) above.

C. ADMINISTRATIVE SEGREGATION AND SPECIAL MANAGEMENT INMATE CLASSIFICATIONS:

1. CLASS I SPECIAL MANAGEMENT INMATE: An inmate who presents a serious threat to the safety and security of the facility, staff and/or any other inmate. This includes inmates in Administrative Isolation (A/I), Disciplinary Isolation (DI), Temporary Isolation (TI), Protective Custody (PC), inmates assigned to the Behavioral Health Unit and inmates in Isolation Cells. Observations shall be documented on a thirty-minute Staff Observation Log. This does not include general population inmates temporarily living in isolation cells. General population inmates temporarily living in isolation cells shall be personally observed by sworn staff at least once every hour on an irregular schedule (P&P 8.13, "Use of Special Cells, Multi-Use Rooms and Modesty Garments).

2. CLASS II SPECIAL MANAGEMENT INMATE: Inmates who demonstrate unusual or bizarre behavior, are under evaluation by medical or mental health clinicians to determine their potential for self-harm, inmates who have a history of persistent "acting-out" in an institutional setting, and inmates who have a documented history of self-inflicted injuries. This category includes inmates diagnosed by competent medical or mental health clinicians as suicidal, and who are at imminent risk to commit or attempt to commit suicide. These inmates shall be personally observed by sworn staff at least twice every thirty minutes and within fifteen minutes of the last observation on an irregular basis. Observations shall be documented on an Inmate Observation Log under "Intensive" Observation.

D. OBSERVATION LOG TYPES:

1. GENERAL OBSERVATION: The level of inmate supervision which requires direct, visual

observations by a deputy at random intervals every successive hour that inmates remain in custody; with no more than sixty (60) minutes passing between observations. The housing unit location must be indicated on the log. These observations will be documented on a GOL.

2. THIRTY-MINUTE GENERAL OBSERVATION LOG: The level of Class I special management inmate supervision which requires direct, visual observations by a deputy at random intervals every successive thirty (30) minutes that the inmate remains in custody; with no more than thirty minutes passing between observations.

3. INTENSIVE OBSERVATION: The level of inmate supervision which requires logging, direct visual observations of an inmate with not more than fifteen (15) minutes passing between observations. These observations will be documented on an IOL or a ROL.

4. CLOSE OBSERVATION: The level of inmate supervision that requires direct, visual observations of each inmate at least once every thirty (30) minutes. These observations will be documented on an IOL or a SCOL.

5. ATTORNEY OBSERVATION: The level of inmate supervision that requires logging direct, visual observations of an inmate and his/her attorney during a contact visit. These observations will be conducted no less than once every thirty (30) minutes; with no more than thirty (30) minutes between checks until the interview is completed ( P&P 17.02 "Interviews").

IV. **PROCEDURES:**

A. OBSERVATION OF INMATES:

1. All inmates shall be monitored and supervised by sworn staff on a regular basis. Minimally, this supervision shall include direct visual observation of each inmate by a deputy. *These observations shall occur at random times each hour.*

    a. *Staff of the opposite sex shall announce their presence on the floor of the housing unit/pod prior to conducting visual cell checks. This will give appropriate warning to inmates who may be changing clothing or using the toilet.*

    b. *All staff will allow inmates who are showering, a reasonable amount of privacy, unless circumstances dictate otherwise.*

    c. Observations of this type will be documented on a General Observation Log (GOL). No individual logging of these inmates is required. This category includes general population inmates temporarily living in isolation cells.

2. SOBERING CELL PLACEMENT: Inmates placed in a sobering cell will be monitored at least once every thirty (30) minutes. Observations will be documented on a Sobering Cell Observation Log (SCOL). *A supervisor shall be notified immediately upon placement.* No inmate shall remain in a sobering cell longer than six hours without an evaluation by medical staff to determine whether the prisoner has an urgent medical problem.

3. **RESTRAINTS:** Once restraints have been applied, staff will initiate intensive observations with not more than fifteen (15) minutes passing between observations and with a Watch Commander's approval, every two hours while they remain in restraints. Observations will be documented on a ROL labeled "Restraints." (P&P 8.26, "Use of Restraints to Prevent Self-Injury, Injuries to Other, Property Damage, etc."). Deputies will complete page #2 of the ROL by providing a complete narrative describing the circumstances that necessitated the use of restraints. If a report number was generated as a result of the incident, the report number shall be listed on page #2 of the ROL.

4. **SPECIAL MANAGEMENT INMATES:**

   a. Special management housing units require direct, visual observation by a deputy at random intervals every successive thirty (30) minutes. Observations are documented on a Thirty–Minute Staff Observation Log.

   b. Special management inmates in a Class I status will be placed in a Close Observation status when they leave the housing unit for court or other appointments or placed in an Isolation Cell. These inmates shall be personally observed by sworn staff at random intervals at least once every thirty (30) minutes. No more than thirty (30) minutes shall pass between checks. Observations shall be documented on an IOL under "Close" observation."

   c. Close Observation (CO) and Intensive Observation (IO) inmates must be kept separate from all other classifications. Pods and other areas where other non-IOL inmates have been; must be inspected and cleared before IOL inmates are allowed to enter.

   d. Intensive Observation inmates shall only be provided one safety blanket and one mattress. All other bedding shall be removed.

   e. Intensive Observation inmates shall only receive their jail issued outer garments. Undergarments, socks and all other personal items shall be removed.

   f. One safety blanket and a modesty garment will be issued to Intensive Observation inmates in a safety cell.

   g. Intensive Observation inmates will be given a "maintenance bag" only (no razors) in lieu of commissary. No canteen or commissary purchases may be made.

   h. Staff must provide continuous direct observation for razor use by an Intensive Observation inmate.

   i. Inmates must always be searched when returning to the unit from court appointments, other external appointments, all internal appointments, and any other time they have left the pod without constant direct supervision.

   j. Inmates who display behavior which results in possible harm to staff and/or destruction of jail property may be placed in the Safety Cell (P&P 8.13 "Use of Special Cells, Multi-Use Rooms and Modesty Garments"). An Intensive Observation Log will be used to document observations of these inmates once every fifteen (15) minutes with no more

than fifteen (15) minutes passing between observations.

5.  Acute Suicidal Inmate Supervision:

   a.  Any inmate determined to be acutely suicidal may be hospitalized at either John George Psychiatric Pavilion (JGPP) or Santa Clara County Department of Corrections (SCCDC). These inmates shall be under the care, treatment, and supervision of mental health clinicians until it is determined by competent medical or mental health authority that they are no longer in need of acute care and may return to the custodial setting.

   b.  No Sheriff's Office observation log will be maintained at JGPP or SCCDC as the inmate is under direct mental health observation and control.

   c.  Once an inmate is identified as acutely suicidal, he/she shall be placed on an Inmate Observation Log, under "Intensive" observation, until transported to JGPP or SCCDC or removed from the observation by Criminal Justice Mental Health (CJMH). If transportation to JGPP or SCCDC is not immediate, the inmate shall be placed into a Safety Cell. These inmates shall be personally observed on an intensive basis and observations shall be documented on a Safety Cell Log.

   d.  Upon return of an inmate from JGPP or SCCDC, an Inmate Observation Log shall be resumed under "Intensive" observation, until the inmate is evaluated by CJMH. During this time, the inmate shall only receive their jail issued outer garments and a safety blanket. All other personal items and clothing such as socks, t-shirts, under garments and all linen will be withheld until the inmate is cleared by CJMH. The IOL will only be discontinued at CJMH's direction.

   e.  Inmates on IOL, "Intensive" observation, will be given a "maintenance bag" only, with no razors, in lieu of commissary. No canteen or commissary purchases may be made.

B.  OBSERVATION LOG:

   1.  Initiation

      a.  Observation logs may be initiated by sworn staff or medical/mental health clinicians working in Santa Rita (SRJ) or Glenn E. Dyer Detention Facility (GEDDF).

      b.  Logs for Close Observations shall be initiated by sworn staff. No medical or mental health assessment is required.

      c.  Logs for Intensive Observations shall be established by sworn staff in consultation with medical or mental health clinicians.

      d.  Sworn staff initiating Inmate Observation Logs shall complete all required information on the form. This shall include the inmate's name, Personal File Number (PFN), facility and housing location, date and time of initiation, type of log, reason for the log, signature, badge number, and verification of notifications. If the log is for "Intensive" observation, approval of on-duty medical or mental health staff must be noted, by name, on the log.

e. In all cases, sworn staff implementing the log will notify their immediate supervisor, Classification, housing control, and the housing unit nurse.

f. Upon notification, the supervisor shall review the circumstances surrounding initiation of the log, approve initiation, ensure that the log is completed correctly, and notify the Watch Commander of the circumstances.

g. Classification shall make the appropriate housing location assignments if a change is necessary, and update the custody files and AJIS records.

h. The housing control technician shall make a red-book entry noting initiation of the log. The entry will include the inmate's name and PFN. Housing control technicians shall also maintain a list of all inmates in their unit who are on Inmate Observation Logs. This list shall be in the housing control log book, including the inmate's name, PFN, and cell location.

i. The housing unit nurse shall address the inmate's immediate medical needs and consult with medical and/or mental health staff as necessary to ensure that follow-up care and evaluations are scheduled.

j. Once established, Inmate Observation Logs shall be maintained until they are discontinued per section IV. B.5 of this order.

2. Completing Observation Logs:

a. Observation logs shall cover a 24-hour period as indicated on the log.

b. Observation logs shall be completed by sworn staff, CJMH personnel, or medical personnel.

c. Each staff member making an observation and entry on a log shall legibly print their name, badge number, and write their initials in the appropriate fields on the bottom of the observation form.

d. Only direct visual observation of the inmate shall be documented on the log. Staff must be able to verify the condition of the inmate by such observation. Video monitoring shall not be used in place of direct visual observations.

e. Observations shall be recorded only as they occur. Staff shall record any observation sequentially. There are to be no blank spaces or gaps left in the log.

f. Staff shall record the observation by noting the time, their initials and badge number, and the appropriate remarks code which indicates the observed inmate activity in the appropriate fields on the log.

g. Staff shall not make log entries based on other staff members' observations.

h. If an incident occurs that requires a memorandum or report, the deputy will write the

appropriate remark on the log, including "See memo," or "see report #00-00000," as applicable. A copy of the memo or report, if available, will be attached to the log to ensure that staff continuing the log is aware of the incident. This will be in addition to a Redbook entry.

i.   If a deputy leaves a housing unit, and he/she knows that the housing unit will be without a deputy to conduct direct visual observation checks, the deputy shall notify an on-duty supervisor of the situation so a deputy can be assigned to conduct such observations. This notification shall be noted in the housing control red book.

j.   If a housing unit does not have a deputy, a supervisor will ensure all observations and log entries are completed within the required time parameters.

k.   At 0001 hours, staff will create a new Restraint Log, or for each Class II inmate, a new Inmate Observation Log. The form heading will contain all information from the original log. The midnight security sergeant will collect the completed logs.

l.   At 0500 hours staff will create a new 60 minute or 30 minute General Observation Log, or Sobering Cell Log.

3.   AT GEDDF, the midnight supervisor will collect all Inmate Observation Logs (IOL) and Restraint Logs concluded at 0001 hours during his/her shift. The day shift supervisor will collect all 60 minute and 30 minute General Observation Logs and Sobering Cell Logs concluded before 0500 hours. The supervisor will review each log for completeness, accuracy, and legibility, then route completed logs to the Watch Commander before the end of their shift. The Watch Commander will forward them to the facility Commanding Officer who will then give them to the Classification Unit for filing.

At SRJ, all Inmate Observation Logs (IOL), Restraint Logs, and Safety Cell Logs will be collected from the Housing Units by the Compliance Sergeant. Following review of these logs by the Compliance Sergeant, they will be forwarded to the Classification Unit for filing. The day shift supervisor will collect all 60 minute and 30 minute General Observation Logs concluded before 0500 hours. The supervisor will review each log for completeness, accuracy, and legibility, then route completed logs to the Watch Commander before the end of their shift. The Watch Commander will forward them to the Compliance Sergeant for filing.

4.   Retaining Observation Logs and Related Reports:

a.   Classification will file completed logs in the inmate classification file. The logs will be maintained in this file, along with any incident or disciplinary reports relating to the circumstances surrounding creation of the log.

b.   Medical reports and/or documentation relating to initiation of an observation log will be maintained in the inmate medical file under the control of the medical care provider.

c.   Psychiatric reports and/or documentation relating to implementation of an observation log will be maintained in the inmate case files under the control of CJMH.

5.  Discontinuing Observation Logs:

    a.  Logs indicating Close Observation that documents disciplinary isolation, temporary confinement in an isolation cell, reclassification from A/S, and/or reclassification from PC status shall be discontinued upon determination by custody and Classification staff. Discontinuation of the log signifies the inmate is no longer in an Administrative Segregation status.

    b.  Logs indicating Intensive Observation shall be discontinued when the medical and/or mental health staff determines that the inmate's condition no longer requires intensive observation. In such cases, Classification shall be contacted. CJMH or medical staff shall legibly print their name on the IOL authorizing cancellation. Additionally, a copy shall be immediately forwarded to Classification so they may review the inmate's status for housing placement.

    c.  The discontinued Inmate Observation Log for either Close or Intensive observation, shall be placed in the inmate's classification file after it is signed by the area sergeant. All other medical/mental health reports and documentation regarding the inmate will remain in the facility contract medical or mental health care provider's files.

    d.  All reports and documentation regarding such reclassifications shall be filed with the observation logs in the inmate's classification file.

    e.  CJMH or medical staff advises that an Intensive Observation is discontinued, a deputy shall notify housing control. The final log entry should note the discontinuance and the name of the medical/mental health staff that who authorized it.

D.  INMATE MOVEMENT: Observation logs must accompany inmates when they are moved to internal or external appointments. Transporting deputies are responsible for log entries during transport. Sworn staff receiving inmates and providing security at the appointment location will continue log entries until the transport back to the housing location.



Exhibit "B."

ACSO P/P 10.05

| ALAMEDA COUNTY SHERIFF'S OFFICE<br><br>DETENTION AND CORRECTIONS<br><br>POLICY AND PROCEDURE | **NUMBER:** 10.05 | **PAGES:** 1 of 9 |
|---|---|---|
| | **RELATED ORDERS:**<br>ACA 4-ALDF-2A-03, 2A-05, 2A-11, 2A-52, 2A-55<br>P&P 3.09, 8.05, 8.24, , 8.37, 10.01, 11.03 | |
| | **ISSUED DATE:** January 5, 1996 | |
| | **REVIEW DATE:** December 11, 2015 | |
| | **REVISION DATE:** December 11, 2015 | |
| **CHAPTER:** Post Orders | **SUBJECT:** Housing Floor/Unit Deputy Post Order | |

I. **PURPOSE:** To describe the duties of housing unit deputies.

II. **POLICY:** Housing unit deputies are responsible for the care, custody, and control of inmates and the security and orderly operation of housing units. Housing unit deputy posts shall be located in or immediately adjacent to inmate living areas to permit staff to hear and respond promptly to emergency situations. Deputies assisting housing unit deputies shall be physically available, or within sight or sound of the housing unit deputy when he/she is entering a housing unit or cell. Except for meal relief or temporary assignment, deputies will not use housing control rooms as work stations. Deputies will maintain personal contact and interaction with staff and inmates, and are expected to carry out their assigned duties pursuant to this Post Order; and if they are unable to carry out their duties, they will immediately notify their supervisor.

III. **DEFINITIONS:**

A. SPECIAL MANAGEMENT:   Inmates in non-mainline classifications.

B. HOUSING UNIT CONTROL LOG (RED BOOK): A permanent record maintained in each housing unit for recording routine information, emergency situations, unusual incidents, and visitors.

IV. **PROCEDURE:**

A. HOUSING UNIT DEPUTIES WILL:

1. Have a working knowledge of, and comply with, all post orders, policies, procedures and directives.

2. Be thoroughly familiar with all inmate rules and regulations.

3. Ensure the security and safety of the housing unit. Ensure the housing unit is clean

before inmates are allowed recreation.

4. Ensure that all security equipment, including keys, are kept secure and in operable condition.

   a. Deputies shall retrieve their housing unit keys from the Key-Tracer box in the alcove prior to beginning their shift.

   b. No housing floor/unit security key shall be removed from the housing floor/unit except in exigent circumstances, pursuant to Detention and Corrections (D&C) Policy and Procedure 8.05, "Santa Rita Jail – Key Control and Emergency Access."

5. Ensure inmates are in their correct cell or dorm.

6. Ensure that only inmates permitted in that housing unit are present.

7. Ensure that all inmates being released comply with the following:

   a. Leave all library books, linen, and clothing, except the set they are wearing; and other county property in the housing unit.

   b. Take all personal property with them.

8. Ensure that security checks are completed during the shift, and the appropriate notation is made in the housing unit control log.  Security checks are for the cleanliness and security inspection of each cell, dorm, and all cell/dorm windows.

9. Notify the shift supervisor if contraband is suspected in the housing unit.

10. Conduct inmate counts at designated times.

11. Monitor the television and dayroom area and regulate the general noise level in the housing unit.

12. Personally observe each general population inmate at least every hour and report any problems between the inmates to the shift supervisor and Classification.

13. Be attentive to duties at all times and follow all general and specific personnel guidelines.

14. Ensure that no personal reading material and/or recreational equipment are in the housing unit.

15. Ensure the deputy's station is off limits to all inmates.

16. Supervise housing unit workers and ensure that all trash is staged for pick up by 2300 hours.

17. Ensure all inmates follow inmate rules/regulations.

18. Ensure that adequate linen and clothing are available on exchange days and perform a linen and clothing exchange as scheduled.  Exchanges will be on a one-for-one basis.

19. Supervise issuing, consumption and clean up after meals.

20. Ensure that all inmates not eating during feeding time are locked down.

21. Oversee sick call, pill call and medical triage.

22. Ensure Commissary gets assistance when required.

23. Ensure that legal material is delivered to the inmate on the shift in which it is received.  Distribute routine inmate mail by 2300 hours.

24. Make periodic security checks in the multipurpose rooms when inmate programs are being conducted.

25. Escort County library staff to cells for delivery and pick up of paperback books. After inmate book carts have been restocked, check carts and books for contraband.

26. Ensure that all newly admitted inmates view the inmate orientation and AIDS videos, receive a new book bag, linen/clothing items; and sign the Automated Jail Information System card indicating they viewed the videos.

27. Sign-in and out pod recreation supplies; playing cards, small games, etc. during inmate pod times.

28. Provide inmates with sick slips, message request slips, grievance forms and commissary order forms when requested.

    a. *Provide inmates with disabilities the assistance needed in completing these forms.*
    b. *Assist those inmates who may have difficulty reading or understanding their rights and protections under PREA or Title 15 by providing explanations to any questions they may have regarding these rights and protections.*
    c. *A housing unit deputy shall minimally be able to explain and provide a knowledge and understanding of the Sheriff's Office Zero Tolerance policy and Inmate Rights as it relates to sexual abuse/harassment and retaliation*

29. Ensure that all cell doors are closed unless an inmate is entering or exiting the cell. During pod/yard times, allow inmates to enter/exit their cells at least once each hour.

30. Ensure that inmates are not restricted from their general rights and privileges, more than necessary, to ensure the safety and security of the staff, other inmates, and/or the facility.

31. Ensure that inmates are offered a minimum of five hours of recreation over a seven day period.

32. Ensure that inmates are housed within the same classification.

33. Obtain input from Classification prior to hiring inmate housing unit workers.

34. Check the Inmate Services' weekly calendar, daily, for scheduled activities.

35. Rotate the pod feeding schedule (i.e. A-B-C one breakfast meal, B-C-A the next breakfast meal etc.).

36. Provide meal relief as directed.

37. Supervise visiting movement.

38. Respond to emergencies as appropriate.

39. Conduct daily activities per the master event schedule and yard schedule.

40. Ensure all work crews are staged and ready for work on time.

41. Ensure inmates are searched upon returning to the housing unit in compliance with Detention and Corrections Policy and Procedure 11.03 (D&C P&P 11.03), "Inmate Searches - Body Cavity, Strip, Visual and Pat."

42. During yard time (the Santa Rita Jail only) allow inmates to enter/exit their housing unit at least once each hour.

43. At the beginning of each shift, inventory the cleaning tools assigned to the housing unit pursuant to D&C Policy and Procedure 8.24, "Santa Rita Jail - Cleaning Tool Inventory, Inventory for Housing Floors/Units, Booking/ITR and the Kitchen," and D&C Policy and Procedure 8.37, "Glenn E. Dyer Detention Facility – Cleaning Tool Inventory, Inventory for Housing Floors/Units, Booking/ITR and the Kitchen." The inventory results will be checked against the previous shift's inventory for consistency and accuracy.

   a. Record the inventory count for each tool, and legibly print and write his/her name and initials in the appropriate fields at the bottom of the tool inventory log.

   b. An adequate supply of cleaning and hygiene items will be on hand at all times.

44. Ensure that two (2) pod doors are not open at the same time.

45. Ensure that a pod door and the sally are not open at the same time.

46. Maintain a permanent log (Red Book and Housing Unit Control Log) to record routine information, emergency situations, and unusual incidents, and disseminate appropriate information to inmates and staff.

B. SPECIAL MANAGEMENT HOUSING: Deputies assigned to special management housing shall observe the inmates once every 30 minutes with no more than 30 minutes between checks on an irregular schedule. Inmates who are violent or mentally disordered or who demonstrate unusual or bizarre behavior receive more frequent observation; suicidal inmates are under intensive observation pursuant to D&C Policy and Procedure 8.12, "Inmate Observation and Direct Visual Supervision." Staff assigned to Special Management Housing Units shall ensure the Housing Unit Control log and red book are maintained on a daily basis. Other duties for specific units include:

1. Ensure that inmates classified as administrative isolation are:

    a. Restrained in waist-chains and/or leg-irons when moved out of the housing unit
    b. Restrained in at least of handcuffs when moved within the housing unit
    c. Moved with a minimum of two deputies
    d. Fed in their cells and only one inmate is in a cell at all times
    e. Housed separately
    f. Moved separately
    g. Given recreation separately
    h. Only allowed to possess a razor or nail clippers on a check out/in basis

2. Ensure that inmates classified as protective custody are moved and fed in a group of the same classification and receive mandated recreation time.

3. Ensure that inmates housed in disciplinary isolation are:

    a. Allowed a minimum of five hours per week out of their cell to exercise, shower, and shave
    b. Logged in on the pod time log when pod time is taken
    c. Allowed one recreational reading book in their cell
    d. Allowed personal hygiene items
    e. Allowed correspondence privileges
    f. Allowed subscription newspapers
    g. Not allowed excessive personal property
    h. Not allowed to visit

4. Ensure that inmates classified as mentally disordered are allowed to recreate in a group of the same classification when they are not a danger to others.

    a. Mentally disordered inmates shall be subject to direct, visual observations once every 30 minutes with no more than 30 minutes between checks pursuant to D&C P&P 8.12.

    b. Suicidal inmates shall be subject to direct, visual observations twice each successive one-half hour pursuant to D&C P&P 8.12.

    c. Mentally disordered inmates are only allowed to possess a razor or nail clippers on a check out/in basis.

C. **PERSON SEARCHES:** Housing unit deputies are responsible for maintaining the security of the facility. To that end, deputies may conduct random pat searches of inmates entering and leaving the housing unit in accordance with D&C Policy and Procedure 11.03, "Inmate Searches - Body Cavity, Strip, Visual and Pat." The initial classification, custody status and search status of each inmate who is to be housed in the general inmate population shall be determined during the booking process by the Classification Unit.

D. Additionally, searches will be conducted as follows:

    1. Inmates returning from external appointments (Alameda County Medical Center, court, funerals, etc.), and work crews will be strip searched in accordance with D&C P&P11.03."

    2. Inmates returning from internal clinic appointments will be pat searched.

    3. Inmates leaving the housing unit or returning from any other internal appointments will be pat searched at the discretion of the deputy, and with supervisor approval.

    4. Any inmate may be strip searched based on circumstance(s) or information indicating such a need. "Reasonable Suspicion" is based on specific and articulable facts that would cause a reasonable deputy to suspect that a person may be concealing contraband. The facts may include current charges, criminal history, or any other factors that would lead a reasonable person to conclude that a strip search will result in discovering contraband. The legal standard to be met is "Reasonable Suspicion," not probable cause. Refer to D&C P&P 11.03 for complete search procedures.

    5. No deputy will search an inmate of the opposite sex, except in extreme emergencies.

    6. Inmates will not be singled out for searches based on race, nationality, gender, or sexual orientation.

E. **LOG BOOKS:** Deputies shall maintain housing unit control logs which are considered to be permanent logs. Logs or log books are official records and are subject to the subpoena process. Comments that are inappropriate or unprofessional are prohibited. Housing unit

control logs shall contain routine, emergency situation and unusual incident information.

1. Information in housing unit control logs and Red Books include:

   a. Employees' name(s) and time on duty
   b. Searches
   c. Incidents or crimes requiring documentation
   d. Unusual occurrences that could pose a safety problem to staff or inmates. This could include suspicious activity, feuds, gang graffiti, etc.
   e. Caution should be exercised when logging information regarding informants or classification information.
   f. Missing safety equipment
   g. Housing unit inspections
   h. Information beneficial to incoming shifts, e.g., laundry or meal shortages and action pending.
   i. Safety checks during lock downs, noting all inmates were visually observed. Observations shall take place:

      1) Once each hour with no more than one hour between checks for maximum, medium and minimum-security inmates.

      2) Once every 30 minutes with no more than 30 minutes between checks on an irregular schedule for special management inmates.

      3) More frequently for inmates who are violent, mentally disordered or who demonstrate unusual or bizarre behavior. Suicidal inmates are to be under intensive observation.

      4) Deputies are instructed to notify a shift sergeant when they are detailed out of their housing unit leaving the housing unit empty of deputy presence. When leaving the house without a deputy, the deputy will place the Observation Logs in the Housing Control so the deputy assuming the responsibility for the observation logs will be able to access them without delay.

   j. Sign out at the end of the shift.

2. Inmate names, Personal File Numbers, housing locations, dates admitted, reasons for arrest, release dates, or any special needs shall be maintained in the AJIS.

3. When a housing unit closes during the year, the deputy station log books shall remain in the unit. The deputies assigned to the unit will indicate the date and time closed.

4. During the week proceeding December 31st of each year, the midnight shift sergeant for each area will issue new log books to each deputy station and control point. Log books will be placed in the vacant housing unit(s) so they are available when the unit re-opens.

Detention and Corrections                                                Page 8 of 9
Policy and Procedure 10.05

5. During the week following January 1st of each year, the dayshift sergeant for each area will collect all deputy station and control point log books from the preceding year.

   a. The dayshift sergeants will ensure all log books have been collected, including those from vacant housing units. They will box and deliver the log books to the Administrative Lieutenant.

   b. The Administrative Lieutenant will confirm all log books are accounted for and store them in the Litigation Office.

   c. On January 2nd of each year, log books previously stored in the Litigation Office will be sent to the archives by the Litigation Sergeant.

F.   HOT FOOD TEMPERATURE TESTING PRIOR TO SERVING TO INMATES

6. Deputies shall obtain the stick thermometer from housing control.

7. Once the deputy believes the food in the re-therm ovens have reached the correct temperature, he/she shall remove one food tray from the oven last filled with food. There is no need to remove a tray from each oven.

8. Using the stick thermometer, the deputy shall take a temperature reading of the food tray to ensure the food has reached 165 degrees. If not, the food shall continue to be heated until it reaches 165 degrees.

9. The food in the tray used for temperature testing shall be discarded.

10. The deputy will clean the stick thermometer with Clorox and return it to housing control.

11. The deputy who tested the food temperature will give their name and the temperature of the food to the Sheriff's Technician who will then record both in the housing control red book.

12. If temperature auditing of the food is not done or if the food fails to reach 165 degrees after repeated attempts, the deputy shall notify his/her Watch Sergeant and prepare a memorandum to the Watch Commander detailing the circumstances and actions taken.

G.   STICK THERMOMETER CALIBRATION:

13. Every Sunday, B-team deputies shall calibrate the stick thermometer.

14. The deputy shall place the stick thermometer in a cup of ice water. After the stick

Detention and Corrections
Policy and Procedure 10.05

thermometer has adjusted to the ice water, it will read 32 degrees. If the stick thermometer is not reading correctly, a nut at the base of the thermometer can be used to adjust the thermometer to 32 degrees. This calibrates the thermometer.

15. If the stick thermometer is inoperable, the deputy shall write a memorandum to the watch commander documenting the circumstances and requesting a new stick thermometer.

16. If the deputy does not perform the stick thermometer calibration, he/she shall prepare a memorandum to the watch commander documenting the reasons why the calibration was not done and the steps he/she has taken or will take to accomplish the necessary calibration of the respective stick thermometer.

17. The deputy's name and the time the calibration was completed shall be recorded in the housing control red book.

H.   ***LAUNDRY, SUPPLY, AND FOOD CARTS:  Deputies are responsible for ensuring all carts delivered to the housing unit are unloaded in a timely manner and all doors to the carts are immediately locked when emptied   All empty carts shall be staged for return as soon as possible.***

1  Your name: Robertson, R., plaintiff,

2  Address:  5325 Brader Blvd.

3  _____ Dublin, CA  94568

4  Phone Number: (775)-335-7773 (mess.)

5  E-mail Address:_____

6  Pro se

7

8  UNITED STATES DISTRICT COURT

9  NORTHERN DISTRICT OF CALIFORNIA

10  Division [check one]: ☐ San Francisco ☐ Oakland ☑ San Jose ☐ Eureka

11

12  ROBERTSON, R.,                    )  Case Number: 20-cv-02523 BLF

13  _____ )  **DECLARATION OF** [name of person signing]

14  Plaintiff,                        )  PLAINTIFF

15  vs.                               )  **IN OPPOSITION TO MOTION** [motion title]

16  KAISER-NEVEL, et. al.,            )  FOR SUMMARY JUDGEMENT (DKT #44) AND

17  _____ )  CROSS-MOTION AS TO STATE LAW CLAIMS

18  _____ )  DATE: February 10th, 2022

19  _____ )  TIME: 9:00 a.m.

20  Defendant.                        )  JUDGE:

21                                    )  Hon.- Beth Labson Freeman

22  *[In the first paragraph, explain who you are. If you are the Plaintiff or Defendant, say so here. If you*
23  *are a witness, say how you are connected to the party or events in this case.]*

24  1. I am the pro se/plaintiff and ~~the primary~~ primary-witness of the subject-incid-

25  ent — Dkt. #27, 12, at #8.

26  2. I have personal knowledge of all facts stated in this declaration, and if called to testify, I

27  could and would testify competently thereto.

28

DECLARATION OF [name] Pro se/Plaintiff
CASE NO.: 20-cv-02523 BLF          ; PAGE 1   OF 3   [JDC TEMPLATE - rev. 2017]

*[Write each fact in a separate, numbered paragraph, starting with 3. You may only write about facts that you know personally, such as events you witnessed. Explain how you know each fact. If you want to include documents, see the Instructions. Make copies of this page if you need more space.]*

1. On personal knowledge, Defendants' lack grounds to move for Summary, based on violating statutary, state/federal law, and their own policies.

2. To illuminate this fact, I have obtained Defendants own policies/procedures, i.e., ACSO P/P 8.12 & P/P 10.05 (ACSO P/P 1.14, "American's With Disabilities Act").

3. As public-information, Alameda County Sheriff's Office Policies/Procedures (here-in, "ACSO P/P"). Are available and easily verifiable at: www.alamedacountysheriff.org/about-us/public poli public-policies).

4. On personal knowledge, all Defendants had various duties, which they had been trained to perform, and did perform in regards to all inmates housed in Unit #22—on the night of the subject-incident...

5. All inmates in Housing Unit #22, except Plaintiff (and inmate Wright) (TAC, 12, at 19). As the only available, qualified witness of the entire subject-incident, i am in possession of most (all facts which occurred, during this incident).

6. Based on this fact, there is an inference, I was targeted, ignored, abanded, proposely purposely "overdetained".

(continued, pg. 3)

DECLARATION OF *[name]* Pro Se / Plaintiff
CASE NO.: 20-cv-02523 BLF          ; PAGE 2 OF 3 *[JDC TEMPLATE - rev. 2017]*

7. At any rate, in my understanding, Cross-Motion for Summary Judgement appears appropriate.

8. As, on 1-23-20, between 6:03pm and approximately 10:00pm, no less than six law enforcement personnel chose to discard my statutory-mandated right to safety-checks.

9. Lastly, Defendants are maintaining a culture of routinelly violating the rights of inmates belonging to our societies protected classes. As illustrative of the Department of Justice's findings, in a recent article, in Prison Legal News (as attached: Exhibit "C".).

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Date: ___1-10-22___   Sign Name: ___R. Robitson - in pro per___

Print Name: ___R. Robertson___

DECLARATION OF *[name]* __Pro Se / Plaintiff__
CASE NO.: __20-cv-02523 BLF__ ; PAGE _3_ OF _3_  *[JDC TEMPLATE - rev. 2017]*

Exhibit "C"

DOJ Findings

(Department of Justice)

You have 2 more free articles available this month. **Subscribe today
(/subscribe/digital/).**

# ✳ (/subscribe/digital/) US DOJ Finds California Alameda County Jail in Violation of Constitution and ADA

Loaded on SEPT. 1, 2021 by Matthew Clarke (/news/author/matthew-clarke/) published in Prison Legal News September, 2021
(/news/issue/32/9/), page 40
Filed under: Americans with Disabilities Act (/search/?selected_facets=tags:Americans%20with%20Disabilities%20Act),
Constitutional Challenges/Law (/search/?selected_facets=tags:Constitutional%20Challenges/Law). Location: California (/search/?
selected_facets=locations:1476).

by Matt Clarke

On April 22, 2021, the Civil Rights Division (CRD) of the U.S. Department of Justice (DOJ) issued a notice to Alameda County, California and its Santa Rita Jail, finding that both engage in practices which violate the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12131-12134, and the U.S. Constitution.

The investigation, conducted under the Civil Rights of ~~Institutional Rights~~ Institutionalized Persons Act (CRIPA), found that by unnecessarily institutionalizing people at its John George Psychiatric Hospital (John George), the county fails to provide services to individual with mental disabilities in the most appropriate setting. Other findings included that the jail failed to provide constitutionally adequate mental health care to prisoners with serious mental health needs, including suicidal prisoners; placed prisoners with serious mental illness in prolonged restrictive housing under unconstitutional conditions; and violated the ADA by denying prisoners with mental health disabilities access to programs and services due to their disabilities.

"The ADA protects individuals with mental health disabilities from unnecessary institutionalization, and the Constitution guarantees all prisoners necessary medical care, including mental health care," noted CRD Principal Deputy Assistant Attorney General Pamela S. Karlan. "Our investigation uncovered evidence of violations that, taken together, result in a system where people with mental health disabilities in Alameda County find themselves unnecessarily cycling in and out of psychiatric institutions and jails because they lack access to proven services that would allow them to recover and participate in community life."

The CRD found that, on any given day, hundreds of people are locked into closed facilities at one of several large sub-acute psychiatric facilities or John George.

Institutionalization at the sub-acute facilities averages six to 24 months. Some stays at John George last weeks, or even months, at which point, due to a lack of alternatives, patients are sent to other segregated psychiatric facilities. Most of the patients in the county's closed psychiatric facilities

could live in their own homes in the community if provided services such as Assertive Community Treatment and Permanent Supported Housing. But such services are not available in Alameda County.

The CRD found that the jail's mental health program failed to provide constitutionally adequate mental health treatment. It had inadequate psychotherapy, treatment planning, discharge planning, programming and treatment, and supervision of suicidal prisoners. The jail also subjected prisoners with serious mental illness to prolonged restrictive housing under unconstitutional conditions, including a failure to provide adequate mental health care.

The CRD noted that half of the prisoners in restrictive housing were believed to have serious mental illness, half the instances of self-harm reviewed occurred in restrictive housing, and 11 of the 14 prisoners who committed suicide between 2015 and 2019 were held in restrictive housing at some point. The CRD also found that jail prisoners with mental health disabilities who were held in the "mental health unit" or in administrative segregation were denied access to an array of programming and transition services that were available to prisoners in general population.

"In *Olmstead v. L.C.*, the U.S. Supreme Court held that Title II of the ADA requires public entities to provide community-based services to persons with disabilities when appropriate services can reasonably be provided to individuals who want them. However, on any given day in Alameda County, hundreds of people are institutionalized for lengthy stays at one of several large, locked psychiatric facilities," wrote Karlan.

The 45-page CRD report elaborates on how those incarcerated in the Santa Rita Jail experience severely deficient mental health treatment, lengthy stays in restrictive housing, and discrimination on the basis of their disabilities, all of which it says can result in serious harm or even death while incarcerated. Such conditions can also place prisoners at serious risk of frequent, unnecessarily lengthy psychiatric institutional stays after release.

The CRD's investigation began in January of 2017 and included multiple visits to county facilities, the last of which took place in August 2019. After being briefed on the CRD's preliminary concerns during the visits, county leadership, including the sheriff, promised progress. By the last visit, some changes had been made but there had been "little actual progress."

John George has 69 beds in three units and a psychiatric emergency room that is used for crisis stabilization. The county also has 200 beds for long-term, sub-acute inpatient services in several "sub-acute" facilities. Many more people are housed at "board and care" facilities providing residential services and minimal daily support.

The jail has a capacity of around 4,000, but only held an average of around 2,400 prisoners during the investigative period. About 40% of jail prisoners are on the mental health caseload. It is estimated that over half of them have serious mental illness. The county's Behavioral Health Care Services provides mental health care at the jail.

Prisoners in the jail's restrictive housing can spend months locked in their cells except for a maximum of five hours per week. Those with serious mental illness have little to no access to mental health treatment, therapy, and programming, placing them at substantial risk of serious harm in

violation of the Eighth and Fourteenth Amendments, according to the CRD notice.

Although jail officials tried to justify lengthy housing of prisoners with serious mental illness in restrictive housing by claiming they would otherwise be violent or would be harmed by other prisoners, the CRD inspectors' review of jail classification records showed instances of such prisoners being placed in restrictive housing because of their serious mental illness and not the jail officials' stated reasons. A review of restrictive housing records showed that prisoners there were actually being permitted only one or two hours outside of their cells per week, not the theoretical five hours. Such isolation can intensify mental illness and lead to self-harm or suicide. Indeed, there were five suicides in restrictive housing between 2015 and 2019.

The notice found that jail prisoners placed in restrictive housing due to their mental health disabilities were being denied access to the programming available to prisoners in general population in violation of the ADA. The programming included academic education, art therapy, culinary arts, computer coding, job readiness, financial literacy, and hospitality. They were also denied access to transition services in education, employment and housing provided by community-based organizations. The jail was found to have no release planning for prisoners with serious mental illness. The result of this lack of support was repeated institutionalization at the jail, John George, and the sub-acute facilities—incarceration by another name.

The usual course of events following a CRD notice is a settlement.

*Editor's Note:* Anyone can file a report or complaint to the CRD using this website: *civilrights.justice.gov* or sending it to: U.S. Department of Justice, Civil Rights Division, 950 Pennsylvania Avenue, NW, Washington, D.C. 20530-0001.


Source: *DOJ Press Release 21-358.*

As a digital subscriber to Prison Legal News, you can access full text and downloads for this and other premium content.

Subscribe today (/subscribe/digital/)

Already a subscriber?   Login (/users/login/)